**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 21-10233 |
| *Plaintiff-Appellant,* | D.C. Nos. 3:20-cr-00026-MMD-WGC-1 3:20-cr-00026-MMD-WGC |
| v. | |
| GUSTAVO CARRILLO-LOPEZ, | |
| *Defendant-Appellee.* | OPINION |

Appeal from the United States District Court
for the District of Nevada
Miranda M. Du, Chief District Judge, Presiding

Argued and Submitted December 8, 2022
Pasadena, California

Before: Carlos T. Bea, Sandra S. Ikuta, and Morgan
Christen, Circuit Judges.

Opinion by Judge Ikuta

## SUMMARY[*]

### Criminal Law

In a case in which the government charged Gustavo Carrillo-Lopez, a citizen of Mexico, with illegally reentering the United States following prior removal in violation of 8 U.S.C. § 1326, the panel reversed the district court's order granting Carrillo-Lopez's motion to dismiss the indictment on the ground that § 1326 violates the equal protection guarantee of the Fifth Amendment and is therefore facially invalid.

Carrillo-Lopez asserted that § 1326 violates the Fifth Amendment because it discriminates against Mexicans and other Central and South Americans. The district court held that Carrillo-Lopez established that § 1326 was enacted with a discriminatory purpose, and that the government failed to prove that § 1326 would have been enacted absent such motive.

Because Carrillo-Lopez's equal protection challenge fails even under the usual test for assessing such claims set forth in *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977), the panel declined to address whether immigration laws should be evaluated through a more deferential framework.

As drafted, § 1326 is facially neutral as to race. The panel therefore turned to the question whether Carrillo-

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Lopez carried his burden of showing that racial discrimination was a motivating factor in enacting § 1326.

Because the most important evidence of legislative intent is the relevant historical evidence, the panel started with the history of § 1326, which was enacted in 1952 as part of the Immigration and Nationality Act (INA). The panel disagreed with Carrillo-Lopez's argument that a Senate Report, the basis for the 1952 legislation, is replete with racism. The panel held that the district court clearly erred when it relied on Congress's decision to override President Truman's veto of the INA as evidence that § 1326 was enacted in part by discriminatory animus. The panel rejected as attenuated Carrillo-Lopez's contention that Congress's intent to discriminate against Mexicans and other Central and South Americans can be inferred from the Department of Justice's use of the word "wetback" in a letter commenting on the INA.

The panel then addressed the legislative history of a prior immigration law, the Act of March 4, 1929 ("the 1929 Act"), which the parties did not dispute was motivated in part by racial animus against Mexicans and other Central and South Americans. The panel rejected Carrillo-Lopez's arguments, with which the district court largely agreed, that (1) the discriminatory purpose motivating the 1929 Act tainted the INA and § 1326 because some of the legislators were the same in 1952 as in 1929, (2) the fact that the 1952 Congress did not expressly disavow the 1929 Act indicates that Congress was motivated by the same discriminatory intent, and (3) the INA constituted a reenactment of the 1929 Act.

In addition to the legislative history, Carrillo-Lopez argued that § 1326's disproportionate impact on Mexicans and other Central and South Americans is evidence that

Congress was motivated by a discriminatory intent in enacting the statute. The panel wrote that evidence that legislation had a disproportionate impact on an identifiable group is generally not adequate to show a discriminatory motive, and here, the evidence that § 1326 had a disparate impact on Mexicans and other Central and South Americans—and that Congress knew of this impact and enacted § 1326 because of the impact—is highly attenuated. The panel held that the district court clearly erred when it relied on the evidence of disproportionate impact without further evidence demonstrating that racial animus was a motivating factor in the passage of the INA.

The panel concluded that the district court clearly erred in its finding that Congress's enactment of § 1326 was motivated in part by the purpose of discriminating against Mexicans or other Central and South Americans. Rather than applying the strong presumption of good faith on the part of Congress, the district court construed evidence in a light unfavorable to Congress, including finding that evidence unrelated to § 1326 indicated that Congress enacted § 1326 due to discriminatory animus against Mexicans and other Central and South Americans. The panel held that the district court also erred in finding that Congress's failure "to repudiate the racial animus clearly present in 1929" was indicative of Congress's discriminatory motive in enacting the INA.

The panel concluded that Carrillo-Lopez did not meet his burden to prove that Congress enacted § 1326 because of discriminatory animus against Mexicans or other Central and South Americans. The panel therefore reversed the district court's order of dismissal and remanded.

**COUNSEL**

Scott A.C. Meisler (argued), Attorney; Lisa H. Miller, Deputy Assistant Attorney General; Kenneth A. Polite Jr., Assistant Attorney General; Appellate Section, Criminal Division, United States Department of Justice; Washington, D.C.; Peter H. Walkingshaw and Robert L. Ellman, Assistant United States Attorneys; Elizabeth O. White, Appellate Chief; Jason M. Frierson, United States Attorney for the District of Nevada; Reno, Nevada; for Plaintiff-Appellant.

Erwin Chemerinsky (argued), UC Berkeley School of Law, Berkeley, California; Lauren Gorman, Ellesse Henderson, Amy B. Cleary, and Wendi L. Overmyer, Assistant Federal Public Defenders; Rene L. Valladares, Federal Public Defender of the District of Nevada; Federal Public Defenders' Office; Las Vegas, Nevada; for Defendant-Appellee.

Christopher J. Hajec, Center for Individual Rights, Washington, D.C.; Gina M. D'Andrea, Immigration Reform Law Institute, Washington, D.C., for Amicus Curiae Immigration Reform Law Institute.

Philip L. Torrey, Attorney; Rachel Landry, Certified Law Student; Harvard Law School Immigration and Refugee Clinical Program; Cambridge, Massachusetts; for Amicus Curiae Dr. S. Deborah Kang.

Ann Garcia and Khaled Alrabe, National Immigration Project of the National Lawyers Guild, Washington, D.C.; Sarah Thompson, National Immigrant Justice Center, San Diego, California; for Amici Curiae Legal Service Providers and Immigrant Rights Organizations.

Max S. Wolson, National Immigration Law Center, Washington, D.C.; Nicholas David Espiritu, National Immigration Law Center, Los Angeles, California; Lourdes Rosado, Andrew Case, and Nathalia Varela, Latinojustice PRLDEF, New York, New York; for Amici Curiae Basic Legal Equality, Justice Strategies, Latinojustice PRLDEF, Legal Aid Justice Center, Massachusetts Law Reform Institute, National Immigration Law Center, and Office of the Marin County Public Defender.

Bradley S. Phillips, Munger Tolles & Olson LLP, Los Angeles, California; Sarah Weiner, Munger Tolles & Olson LLP, Washington, D.C.; for Amici Curiae Asian Americans Advancing Justice, Conference of Asian Pacific American Law Faculty, Human Rights First, Northwest Immigrant Rights Project, and UNLV Immigration Clinic.

Amanda Valerio, Paul Weiss Rifkind Wharton & Garrison LLP, Washington, D.C.; Alexia D. Korberg, Melina Meneguin Layerenza, and Patrick McCusker, Paul Weiss Rifkind Wharton & Garrison LLP, New York, New York; for Amici Curiae Immigration Scholars.

Ahilan Arulanantham, UCLA School of Law, Los Angeles, California; Eric Fish, UC Davis School of Law, Davis, California; Yaman Salahi, Edelson P.C., San Francisco, California; for Amici Curiae The Aoki Center of Critical Race and Nation Studies, the Center for Immigration Law and Policy, and the Southern Poverty Law Center.

## OPINION

IKUTA, Circuit Judge:

Gustavo Carrillo-Lopez, a citizen of Mexico, was indicted for illegally reentering the United States following prior removal, in violation of 8 U.S.C. § 1326.  He successfully moved to dismiss the indictment on the ground that § 1326 violates the equal protection guarantee of the Fifth Amendment and is therefore facially invalid.  Because Carrillo-Lopez did not carry his burden of proving that § 1326 was enacted with the intent to be discriminatory towards Mexicans and other Central and South Americans, and the district court erred factually and legally in holding otherwise, we reverse.

I

Carrillo-Lopez is a citizen of Mexico.  He was removed from the United States twice, once in 1999 and once in 2012.  Before his removal in 2012, he was convicted of felony drug possession and misdemeanor infliction of corporal injury on a spouse.  On some date after 2012, he reentered the United States.  On June 13, 2019, a search of his residence uncovered two firearms and plastic bags containing methamphetamine, cocaine, and heroin.  Carrillo-Lopez was arrested and subsequently pleaded guilty to a single count of trafficking a controlled substance.  On June 25, 2020, he was indicted for illegal reentry following prior removal, in violation of 8 U.S.C. § 1326(a), and subject to enhanced penalties under § 1326(b) due to his prior convictions.  Under § 1326(a), "any alien who . . . has been denied admission, excluded, deported, or removed  . . . and thereafter . . . enters, attempts to enter, or is at any time found in, the United States," without proper authorization, is

subject to criminal penalties.  8 U.S.C. § 1326(a).[1]  Section 1326(b) imposes enhanced criminal penalties for aliens who have previously been convicted of specified offenses.  *Id.* § 1326(b).

Carrillo-Lopez moved to dismiss the indictment on the ground that § 1326 violates the Fifth Amendment because it discriminates against Mexicans and other Central and South Americans.[2]  The district court granted the motion in a

---

[1] Section 1326(a) provides in full:

> Subject to subsection (b) [(imposing enhanced penalties)], any alien who—
>
> (1) has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding, and thereafter
>
> (2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously denied admission and removed, unless such alien shall establish that he was not required to obtain such advance consent under this chapter or any prior Act,
>
> shall be fined under title 18, or imprisoned not more than 2 years, or both.

8 U.S.C. § 1326(a).

[2] In his brief, Carrillo-Lopez primarily refers to Latinos, and states that "'Latino' refers to people from Latin American countries, including Mexico."  Elsewhere in the record, this population group is variously referred to as Hispanics, Latinx, and Central and South Americans.  For

detailed opinion, holding that Carrillo-Lopez established that § 1326 was enacted with a discriminatory purpose, and that the government failed to prove that § 1326 would have been enacted absent such motive.  The government timely appealed.

We have jurisdiction under 18 U.S.C. § 3731, and we review de novo "the constitutionality of a statute as a question of law," *United States v. Huerta-Pimental*, 445 F.3d 1220, 1222 (9th Cir. 2006), as well as "the dismissal of an indictment on the ground that the underlying statute is unconstitutional," *United States v. Rundo*, 990 F.3d 709, 713 (9th Cir. 2021) (per curiam).  A determination that a statute was enacted in part due to discriminatory animus is a factual finding reviewed for clear error.  *Abbott v. Perez*, 138 S. Ct. 2305, 2326 (2018).

## II

### A

The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. CONST. amend. V.  The Supreme Court has determined that "the Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976).  The "Court's approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment."  *Weinberger v. Wiesenfeld*, 420

---

purposes of consistency and clarity, we refer to the group that § 1326 allegedly targets as Mexicans and other Central and South Americans.

U.S. 636, 638 n.2 (1975).[3]    Therefore, cases analyzing claims of state discrimination in violation of the Equal Protection Clause are equally applicable to claims of federal discrimination under the equal protection guarantee of the Fifth Amendment.  *See Buckley v. Valeo*, 424 U.S. 1, 93 (1976) ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment.").

Assessing an equal protection challenge requires a court to "measure the basic validity of [a] legislative classification." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979).    When a statute makes an express classification on the basis of race, it "is presumptively invalid and can be upheld only upon an extraordinary justification." *Shaw v. Reno*, 509 U.S. 630, 643–44 (1993) (quoting *Feeney*, 442 U.S. at 272).

A statute that is facially neutral may also violate equal protection principles, but only if a discriminatory purpose was a motivating factor for the legislation.  *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).    "Whenever a challenger claims that a . . . law was enacted with discriminatory intent, the burden of proof lies with the challenger." *Abbott*, 138 S. Ct. at 2324. To establish that the lawmakers had a discriminatory purpose in enacting specific legislation, it is not enough to show that the lawmakers had an "awareness of [the] consequences" of the legislation for the affected group, that those consequences were "foreseeable," *Feeney*, 442 U.S. at 278–79, or that the legislature acted "with indifference to"

---

[3] The Fourteenth Amendment provides that a state shall not "deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV.

the effect on that group, *Luft v. Evers*, 963 F.3d 665, 670 (7th Cir. 2020). Rather, the lawmaking body must have "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Feeney*, 442 U.S. at 279. Therefore, the plaintiff must "prove by an evidentiary preponderance that racial discrimination was a substantial or motivating factor in enacting the challenged provision." *Harness v. Watson*, 47 F.4th 296, 304 (5th Cir. 2022) (citing *Hunter v. Underwood*, 471 U.S. 222, 227–28 (1985)).

There is no bright-line rule for determining whether the plaintiff has carried this burden. Rather, the Supreme Court has recognized that "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. Courts must consider the totality of the evidence presented by the plaintiff in light of certain presumptions and principles established by the Supreme Court.

The most important evidence of legislative intent is the historical evidence relating to the enactment at issue. The Court considers factors such as (1) the "historical background of the decision," (2) the "specific sequence of events leading up to the challenged decision," (3) "[d]epartures from the normal procedural sequence," (4) "[s]ubstantive departures," and (5) "legislative or administrative history." *Id.* at 267–68.

This evidence must be considered in light of the strong "presumption of good faith" on the part of legislators. *Miller v. Johnson*, 515 U.S. 900, 916 (1995). It is "the plaintiffs' burden to overcome the presumption of legislative good faith

and show that the [legislature that enacted the current law] acted with invidious intent." *Abbott*, 138 S. Ct. at 2325. We must also consider the evidence in context. In evaluating "contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports," *Arlington Heights*, 429 U.S. at 268, a court must be aware that the statements of a handful of lawmakers may not be probative of the intent of the legislature as a whole. *See United States v. O'Brien*, 391 U.S. 367, 384 (1968) ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it . . . ."); *see also League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 939 (11th Cir. 2023) ("[A] statement or inquiry by a single legislator would constitute little evidence of discriminatory intent on the part of the legislature."). And the views of an earlier legislature are generally not probative of the intent of a later legislature, *see, e.g.*, *Abbott*, 138 S. Ct. at 2325; *United States v. Dumas*, 64 F.3d 1427, 1430 (9th Cir. 1995), particularly when the subsequent legislature has "a substantially different composition," *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349 n.22 (2021) (citation and quotation marks omitted).

Because "[p]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful," *Abbott*, 138 S. Ct. at 2324 (quoting *City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality opinion)), "the presumption of legislative good faith [is] not changed by a finding of past discrimination," *id*. In *Abbott*, for instance, the Texas legislature enacted a 2013 redistricting plan in response to a challenge to its original 2011 plan. *Id.* at 2316–17. A three-judge Texas court invalidated the 2013 plan on the ground that it was tainted by the legislature's

discriminatory intent in passing the predecessor 2011 plan. *Id.* at 2318. The Supreme Court reversed, stating "there can be no doubt about what matters: It is the intent of the 2013 Legislature." *Id.* at 2325. Because "it was the plaintiffs' burden to overcome the presumption of legislative good faith and show that the 2013 Legislature acted with invidious intent," the Texas court erred in reversing the burden of proof and imposing on the state "the obligation of proving that the 2013 Legislature had experienced a true 'change of heart' and had 'engage[d] in a deliberative process to ensure that the 2013 plans cured any taint from the 2011 plans.'" *Id.* (citation omitted). Therefore, there is no requirement that the government show that a subsequent legislature "somehow purged the 'taint'" of a prior legislature, such as by expressly disavowing the earlier body's discriminatory intent. *Id.* at 2324. Rather, as stated in *Abbott*, all that matters is the intent of the legislature responsible for the enactment at issue, and it is the "plaintiffs' burden to overcome the presumption of legislative good faith and show that" the legislative body "acted with invidious intent." *Id.* at 2325.

In addition to historical evidence relating to the enactment at issue, courts may consider evidence that the legislation at issue has a disproportionate impact on an identifiable group of persons. But while "[d]isproportionate impact is not irrelevant," it is generally not dispositive, and there must be other evidence of a discriminatory purpose. *Davis*, 426 U.S. at 242. "[E]ven if a neutral law has a disproportionately adverse effect upon a racial minority, it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose." *Feeney*, 442 U.S. at 272. A court may not infer a discriminatory motive based solely on evidence of a

disproportionate impact except in rare cases where "a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action." *Arlington Heights*, 429 U.S. at 266. Moreover, if the enactment of the legislation and the disproportionate impact are not close in time, the inference that a statute was enacted "because of" its impact on an identifiable group is limited. *Feeney*, 442 U.S. at 279. Thus, "unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value." *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987); *see also Johnson v. Governor of the State of Fla.*, 405 F.3d 1214, 1222 n.17 (11th Cir. 2005) (en banc) (rejecting reliance on "present" day evidence of disparate impact where the plaintiffs challenged a 1986 law as discriminatory).

If the challenger satisfies the burden of showing a discriminatory purpose was a motivating factor, the burden then shifts to the government to show that "the same decision would have resulted even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 270 n.21. If the government carries this burden, there is no equal protection violation even if there is evidence that the legislature had a discriminatory motive. *Id.*

If the challenger succeeds in showing that the legislation or official action is motivated in part by discrimination based on race or national origin, and the government would not have enacted the same legislation absent such motivation, the enactment violates equal protection principles unless the government has a compelling reason for enacting it. *See City of Cleburne. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).

B

The government contends that the standard described above is inapplicable to immigration laws. Rather, it argues, such laws should be evaluated through a more deferential framework because the Court has held that courts must defer "to the federal government's exclusive authority over immigration matters."

It is true that the Court has "long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953)). More recently, the Court has stated that "[b]ecause decisions in these [immigration] matters may implicate 'relations with foreign powers,' or involve 'classifications defined in the light of changing political and economic circumstances,' such judgments 'are frequently of a character more appropriate to either the Legislature or the Executive.'" *Trump v. Hawaii*, 138 S. Ct. 2392, 2418–19 (2018) (quoting *Mathews v. Diaz*, 426 U.S. 67, 81 (1976)). Further, the Court has (without precise explanation) applied a deferential standard, akin to rational basis review, in some contexts involving immigration cases. *See, e.g.*, *Fiallo*, 430 U.S. at 792–96 (giving minimal scrutiny to a gender-based distinction in an immigration law); *cf. Hawaii*, 138 S. Ct. at 2441 (Sotomayor, J., dissenting) (arguing that the majority, "without explanation or precedential support, limits its review of the [Presidential Proclamation barring entry of aliens from countries that were predominantly Muslim] to rational-basis scrutiny").

Nevertheless, the Supreme Court has also (again, without precise explanation) applied higher scrutiny to immigration actions. For instance, in considering whether the Executive Branch's rescission of an administrative immigration relief program violated the equal protection guarantee of the Fifth Amendment, the Court considered whether the plaintiffs raised "a plausible inference that an 'invidious discriminatory purpose was a motivating factor' in the relevant decision." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1915 (2020) (quoting *Arlington Heights*, 429 U.S. at 266). Neither the Supreme Court nor we have directly addressed the issue regarding which standard of review applies to equal protection challenges to immigration laws.[4] We decline to address this issue, because (as explained below), Carrillo-Lopez's equal protection challenge fails even under the usual test for assessing such claims set forth in *Arlington Heights*.

## III

We now turn to the question whether the district court erred in concluding that Carrillo-Lopez carried his burden of proving that § 1326 is invalid under equal protection principles because it discriminates against Mexicans and other Central and South Americans.

---

[4] *Ramos v. Wolf* also held that a higher standard of scrutiny applies to a congressional enactment and the lower standard of scrutiny is limited to enactments by the Executive Branch. 975 F.3d 872, 895–96 (9th Cir. 2020). But that decision has been vacated and scheduled for rehearing en banc, *see Ramos v. Wolf*, 59 F.4th 1010, 1011 (9th Cir. 2023), and therefore has no precedential effect. *See, e.g.*, *Durning v. Citibank, N.A.*, 950 F.2d 1419, 1424 n.2 (9th Cir. 1991) ("[A] decision that has been *vacated* has no precedential authority whatsoever.").

A

Section 1326 provides that "any alien who . . . has been denied admission, excluded, deported or removed" from the United States and, without permission, later "enters, attempts to enter, or is at any time found in, the United States" shall be imprisoned for up to two years.  8 U.S.C. § 1326(a).

As drafted, § 1326 is facially neutral as to race. Therefore, we turn to the question whether Carrillo-Lopez has carried his burden of showing "that racial discrimination was a substantial or motivating factor in" enacting § 1326. *Hunter*, 471 U.S. at 225 (citation omitted).  Because the most important evidence of legislative intent is the relevant historical evidence, we start with the history of § 1326, which was enacted in 1952 as part of the Immigration and Nationality Act.  S. 2842, 82d Cong., 2d Sess., § 276 (1952); Immigration and Nationality Act of 1952, 8 U.S.C. § 1101 *et seq.* [hereinafter INA].

B

The history of the INA began in 1947, when the Senate directed the Senate Committee on the Judiciary "to make a full and complete investigation of [the country's] entire immigration system" and to provide "recommendations for changes in the immigration and naturalization laws as it may deem advisable."  S. REP. NO. 81-1515, at 803 (1950) [hereinafter Senate Report].   This effort was "a most intensive and searching investigation and study over a three year period."  *Pena-Cabanillas v. United States*, 394 F.2d 785, 790 (9th Cir. 1968).  The subcommittee tasked with this investigation examined "a great volume of reports, exhibits, and statistical data," examined officials and employees of the Immigration and Naturalization Service (INS) and

various divisions of the State Department, and made field investigations throughout Europe and the United States, as well as at the Mexican border, in Canadian border cities, and in Havana, Cuba.  Senate Report, at 2–4.  Recognizing that the immigration law of the United States was established by "2 comprehensive immigration laws which are still in effect" and "over 200 additional legislative enactments," as well as "treaties, Executive orders, proclamations, and a great many rules, regulations and operations instructions," the subcommittee determined that it would "draft one complete omnibus bill which would embody all of the immigration and naturalization laws."  *Id.* at 4.

The extensive 925-page Senate Report provided a comprehensive analysis of immigration law.  Part 1 set out a detailed review of the immigration system, providing (among other things) a description of the "[r]aces and peoples of the world," a "[h]istory of the immigration policy of the United States," a "[s]ummary of the immigration laws," and a discussion of the "characteristics of the population of the United States."  *Id.* at iii–iv.  It included a discussion of excludable and deportable classes of aliens, as well as discussing admissible aliens, with special focus on so-called "quota" and "nonquota" immigrants.[5]  *Id.* at iii, 68–71.

In connection with the discussion of the characteristics of the population of the United States in Part 1, the Senate Report provided an overview of specified characteristics of different population groups in the Americas, including

---

[5]A "quota immigrant is . . . an alien entering for permanent residence" who is "subject to numerical restriction, as distinguished from the nonquota immigrant who is likewise entering for permanent residence but who is not subject to numerical restriction."  Senate Report, at 420.

Canadians and Mexicans.  These sections all followed the same template for each population group.  In discussing Mexicans, the Senate Report covered (among other things) the population change since 1820 due to Mexican immigrants who had legally and illegally entered the United States, the geographical distribution of native-born and foreign-born Mexicans, the "naturalization and assimilation" of Mexicans, and employment and crime data. *Id.* at 149–50.  This section also included this data for "other Latin Americans." *Id.* at 150–52.

One of the longest sections in Part 1, covering some 173 pages, discussed whether to continue "the numerical restriction of immigration through the imposition of quotas." *Id.* at 417.  As explained in the Senate Report, the existing quota system fixed the number of persons from each covered nation who could enter the United States for permanent residence at the "number which bears the same ratio to 150,000 as the number of inhabitants in the United States in 1920 of that nationality bears to the total number of inhabitants in the continental United States in 1920." *Id.* at 420.  Historically, "[t]he first numerical restriction" on immigration into the United States "was imposed by the Quota Act of May 19, 1921," to address concerns "in the period immediately following [World War I], as a result of growing labor unrest, increasing unemployment, and general alarm over the potential flood of 'newer' immigrants from war-torn Europe." *Id*. at 419.  Over the decades, limitations on quota immigrants changed, such as the removal of the bar to Chinese immigration. *See id*. at 422, 426.  Immigrants from Western Hemisphere countries (including Mexico and other countries in Central and South America) were excluded from this national-origin quota system. *Id.* at 459.

The Senate Report acknowledged that the national-origin quota system was controversial because some opponents labeled it as "discriminatory in the treatment of certain nationalities of Europe," *id.* at 448, and therefore attempted to "examine this controversial subject objectively in order to present an unbiased appraisal of the quota system." *Id*. at 417. The Senate Report ultimately recommended retaining the quota system, but making "changes in existing law both with respect to the manner in which quotas [were] established for intending immigrants and the determination of preferences within the quotas." *Id.* at 588.

Part 1 also included a chapter on procedures relating to immigrants and nonimmigrants. *Id.* at viii–ix. This section discussed procedures for admission, exclusion, expulsion, bonds, and immigration offenses. *Id.* at 612–56. In the section on immigration offenses, the Senate Report discussed illegal reentry after deportation, and explained that a prior immigration law, the Act of March 4, 1929, "ma[de] it a felony for any deported alien who ha[d] not received permission to reapply for admission to enter or attempt to enter the United States." *Id.* at 646 (citation omitted). In making "[s]uggestions relating to criminal provisions," the Senate Report noted that statements from witnesses and field offices of the INS stressed the "difficulties encountered in getting prosecutions and convictions, especially in the Mexican border area" because "many flagrant violators of the immigration laws [were] not prosecuted or, if prosecuted, [got] off with suspended sentences or probation." *Id.* at 654. The Senate Report recommended that "enact[ing] legislation providing for a more severe penalty for illegal entry and smuggling, as suggested by many, would not solve the problem." *Id*. at 654–55. Instead, it recommended that the

"provisions relating to reentry after deportation . . . be carried forward in one section and apply to any alien deported for any reason and provide for the same penalty." *Id.* at 656.

Part 2 of the Senate Report provided a detailed overview of the naturalization system, including the history of naturalization laws and citizenship. *See id*. at x–xii. In the context of discussing eligibility for naturalization, the Senate Report stated that the subcommittee had held "special hearings" on "[t]he subject of racial eligibility to naturalization." *Id*. at 710. The subcommittee concluded that "in consideration of our immigration laws, the subcommittee fe[lt] that the time ha[d] come to erase from our statute books any discrimination against a person desiring to immigrate to this country or to become a naturalized citizen, if such discrimination [was] based solely on race." *Id*. The subcommittee recommended that "all prerequisites for naturalization based solely on the race of the petitioner be eliminated from our naturalization laws," as set forth in the Senate Report. *Id.*[6]

After the issuance of the Senate Report, Senator Pat McCarran introduced S. 3455 in the Senate, which provided for the repeal of then-current immigration and naturalization laws and the enactment of a completely revised immigration and naturalization code. Off. of the Historian, U.S. Dep't of State, *Foreign Relations of the United States, 1952-54, General: Economic and Political Matters, Vol. 1, Pt. 2*, at 1569–70 (William Z. Slany ed., 1983). After input from the staff of the Senate Immigration Subcommittee as well as

---

[6] Part 3 of the Senate Report discussed communism and "subversive" aliens, and Part 4 contained appendices. Senate Report, at xii–xviii.

experts from the INS and the Department of State, and extensive revisions, Senator McCarran introduced S. 716, a revised version of S. 3455, and Representative Francis E. Walter introduced an identical companion House bill, H.R. 2379. *Id.* at 1570. Extensive joint hearings were conducted by various House and Senate subcommittees. *Id.*

Following the joint hearings, and in the course of numerous conferences, Senator McCarran and Representative Walter introduced the final versions of the bill in the Senate and the House (S. 2550 and H.R. 5678, respectively). *Id.* According to a Senate Judiciary Committee Report, the revised bill made several significant changes from prior law. The changes included a "system of selective immigration within the national origins quota system." S. REP. NO. 82-1137, at 3 (1952) [hereinafter Senate Judiciary Committee Report]. The national-origin quota system was revised to use a new formula and with an alteration in quota preferences to aliens with specified skills and relatives of United States citizens and alien residents. 98 Cong. Rec. 5796 (1952); *id.* at 4996 (statement of Sen. Thye) (stating that he was impressed with the argument that quotas should be given "to facilitate reunion of families and relatives" and "provide needed workers and desirable skills for this country"). The bills also removed "[r]acial discriminations and discriminations based upon sex." Senate Judiciary Committee Report, at 3; *see also* 98 Cong. Rec. 5765 (1952) (statement of Sen. McCarran) ("Under the provisions of S. 2550, no one will be inadmissible to the United States solely because of race and since the bill is removing discriminations from the law in this regard, it cannot be said that new racial discriminations are being introduced."). Further, "[s]tructural changes [were] made in the enforcement agencies for greater efficiency;" and the

bills strengthened "[t]he exclusion and deportation procedures." Senate Judiciary Committee Report, at 3. The Senate Judiciary Committee Report made only one mention of the reentry provisions. It stated: "In addition to the foregoing, criminal sanctions are provided for entry of an alien at an improper time or place, for misrepresentation and concealment of facts, for reentry of certain deported aliens, for aiding and assisting subversive aliens to enter the United States, and for importation of aliens for immoral purposes." *Id.* at 37.[7] The Senate Judiciary Committee Report did not specifically reference the provision that penalized reentry after removal (Section 276 of Senate Bill 2550).

Congressional debates over the final bill focused on the national-origin quota system. Critics argued that this system was arbitrary because it favored the "so-called Nordic strain" of immigrants but disfavored "people from southern or eastern Europe." 98 Cong. Rec. at 5768 (1952) (statement of Sen. Lehman). Senator Hubert Humphrey and Senator Herbert Lehman sponsored a competing bill, S. 2842, which aimed at making "the entire quota system more flexible and more realistic," *id.* at 2141, but the bill did not garner enough support to be given a hearing, *id.* at 5603.

---

[7] A House Report on H.R. 5678, states only:

> In addition to the foregoing, criminal sanctions are provided for entry of an alien at an improper time or place, for misrepresentation and concealment of facts, for reentry of certain deported aliens, for aiding and assisting subversive aliens to enter the United States, and for importation of aliens for immoral purposes.

H.R. REP. NO. 82-1365, at 68 (1952).

Congressional debates did not mention the illegal reentry provision, Section 276. "An exhaustive reading of the congressional debate indicates that Congress was deeply concerned with many facets of the [INA], but §§ 1325 and 1326 were not among the debated sections." *United States v. Ortiz-Martinez*, 557 F.2d 214, 216 (9th Cir. 1977). Carrillo-Lopez concedes that "[c]ongressional debate focused on the national-origins provisions, not the illegal reentry statute." There was no discussion of Section 276's impact on Mexicans or other Central and South Americans.

The controversy over the national-origin quota system continued even after the bill (now referred to as H.R. 5678) passed both houses of Congress, because President Truman vetoed the bill due to his opposition to the national-origin quota system. *See Veto of Bill to Revise the Laws Relating to Immigration, Naturalization, and Nationality*, 1 PUB. PAPERS 441–45 (June 25, 1952). In his veto statement, President Truman first made clear that the bill "contains certain provisions that meet with my approval," including removing "[a]ll racial bars to naturalization." *Id.* at 441. Nevertheless, President Truman opposed a number of the bill's features, most significantly its provisions continuing "the national origins quota system." *Id.* at 442. President Truman explained that he had "no quarrel" with the general idea of quotas, but stated that the national-origin quota system was "too small for our needs today and . . . create[d] a pattern that [was] insulting to large numbers of our finest citizens, irritating to our allies abroad, and foreign to our purposes and ideals." *Id.* According to President Truman, the system perpetuated by the bill discriminated against people of Southern and Eastern Europe, in favor of immigrants from England, Ireland, and Germany, which President Truman argued was improper both on moral and

political grounds. *Id.* at 442–43. In particular, President Truman noted the United States' alliance with Italy, Greece, and Turkey, and the need to help immigrants from Eastern Europe who were escaping communism. *Id.* at 443. President Truman did not mention Mexicans or other Central and South Americans, to whom the national-origin quota system did not apply.[8] Nor did he mention the provision criminalizing reentry, Section 276. Congress enacted the INA over President Truman's veto. 98 Cong. Rec. 8253–68 (1952).

As enacted, Section 276 (subsequently codified as 8 U.S.C. § 1326), replaced the reentry offenses set forth in three prior statutory sections.[9] In creating a single offense,

---

[8] The 1924 Act, which introduced the national-origin quota system, exempted all Western Hemisphere countries from the system.

[9] The Supreme Court explained that

> [b]efore § 1326 was enacted, three statutory sections imposed criminal penalties upon aliens who reentered the country after deportation: 8 U.S.C. § 180(a) (1946 ed.) (repealed 1952), which provided that any alien who had been "deported in pursuance of law" and subsequently entered the United States would be guilty of a felony; 8 U.S.C. § 138 (1946 ed.) (repealed 1952), which provided that an alien deported for prostitution, procuring, or similar immoral activity, and who thereafter reentered the United States, would be guilty of a misdemeanor and subject to a different penalty; and 8 U.S.C. § 137–7(b) (1946 ed., Supp. V) (repealed 1952), which stated that any alien who reentered the country after being deported for subversive activity would be guilty of a felony and subject to yet a third, more severe penalty.

it also eliminated the three different criminal penalties imposed by these three prior statutes, and instead subjected all reentry defendants to the same penalty: two years' imprisonment and a fine.  H.R. 5678, 82d Cong., 2d Sess., § 276 (Apr. 28, 1952); *see United States v. Mendoza-Lopez*, 481 U.S. 828, 835–36 (1987).  The new Section 276 also added a new basis for liability: "being 'found in' the United States" after a prior deportation—a "continuing" offense that "commences with the illegal entry, but is not completed until" the defendant is discovered.  *United States v. Ruelas-Arreguin*, 219 F.3d 1056, 1061 (9th Cir. 2000).  Finally, § 1326 eliminated the language that would permit aliens to bring collateral challenges to the validity of their deportation proceedings in subsequent criminal proceedings.  *See Mendoza-Lopez*, 481 U.S. at 836.[10]

### C

We now turn to Carrillo-Lopez's arguments that Congress was motivated in part by discrimination against Mexicans and other Central and South Americans in enacting § 1326 as part of the INA in 1952.

---

*United States v. Mendoza-Lopez*, 481 U.S. 828, 835 (1987) (citing H.R. REP. NO. 82-1365, at 219–20 (1952)).

[10] After the Supreme Court ruled that precluding such collateral challenges would violate an alien's due process rights, *see Mendoza-Lopez*, 481 U.S. at 832, 839, "Congress responded by enacting § 1326(d)," which "establishe[d] three prerequisites that defendants facing unlawful-reentry charges must satisfy before they can challenge their original removal orders." *United States v. Palomar-Santiago*, 141 S. Ct. 1615, 1619 (2021) (citing Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), § 441, 110 Stat. 1279).

1

Because historical evidence relating to the enactment at issue is most probative, we first consider Carrillo-Lopez's arguments relating to the legislature's enactment of § 1326 in 1952. Carrillo-Lopez begins by arguing that the Senate Report, the basis for the 1952 legislation, is "replete with racism." He points to certain statements in Part 1 of the Senate Report, which discussed different population groups. In the subsection on Mexicans, the Senate Report stated that since 1820, "over 800,000 immigrants have legally entered," and "it has been reliably estimated that Mexican aliens are coming into the United States illegally at a rate of 20,000 per month." Senate Report, at 149. Later in Part 1, a chapter discussing the historical background and current law regarding excludable and deportable classes of aliens noted that a 1917 immigration law excluded from admission aliens who were previously deported from the United States. *Id.* at 335–36. The Senate Report stated that "[t]he largest number of persons, who as aliens are deported twice, are deported to Mexico. The problem appears, therefore, to be principally a southern border problem and is discussed in the section on deportation problems." *Id.* at 365.

Carrillo-Lopez argues that the statements that "Latino immigrants were 'coming into the United States illegally at a rate of 20,000 per month,' and the statement that people entering illegally after being deported is 'principally a southern border problem,'" evince racism. Carrillo-Lopez also describes statements in Part 1 as "denigrat[ing] Latino immigrants as particularly undesirable due to alleged: low-percentage of English speakers; inability to assimilate to 'Anglo-American' culture and education, with Latino

students believed to be 'as much as 3 years behind'; and a high number receiving 'public relief.'"[11]

We disagree. In context, the statements Carrillo-Lopez identified in the Senate Report merely provided a factual description of Mexicans and other Latin Americans, along with all other "races and peoples." There is no language that "denigrates Latino immigrants as particularly undesirable." Indeed, neither Carrillo-Lopez nor the district court identified any racist or derogatory language regarding Mexicans or other Central and South Americans in these pages, or anywhere else in the 925-page Senate Report.

Second, Carrillo-Lopez contends that Congress's discriminatory intent in enacting § 1326 can be inferred from Congress's decision to enact the INA over President Truman's veto. The district court agreed with this argument.[12] But President Truman's opposition to the national-origin quota system, the central reason for his veto, sheds no light on whether Congress had an invidious intent

---

[11] The district court did not identify any language in either the Senate Report or congressional record that evinced racism, but rather relied on the 1952 Congress's failure to repudiate a prior immigration law, Act of March 4, 1929, Pub. L. No. 70-1018, 45 Stat. 1551 (the "1929 Act"), as well as other historical evidence discussed below.

[12] The district court concluded that Congress's "failure to heed President Truman's call to 'reimagine' immigration while simultaneously making the INA, and particularly Section 1326, more punitive in nature, is evidence of at least indifference to the nativist motivations of the statute's predecessor," and therefore "contribute[d] to [the] finding that Carrillo-Lopez [had] met his burden" of showing that enacting § 1326 was motivated by discriminatory intent. This conclusion ignores the presumption of legislative good faith, which compels the conclusion that indifference to prior legislation is not evidence of discriminatory animus. *Abbott*, 138 S. Ct. at 2325.

to discriminate against Mexicans and other Central and South Americans in enacting § 1326. Mexicans and other Central and South Americans were not part of the national-origin quota system, *see* Senate Report, at 472, and as the district court conceded, "President Truman did not explicitly address racism as to Mexican[s] or" other Central and South Americans, and "did not address Section 1326 specifically." Further, President Truman's opinion on the legislation is not evidence of Congress's motivation in enacting § 1326. *See United States v. Barcenas-Rumualdo*, 53 F.4th 859, 867 (5th Cir. 2022). The district court clearly erred when it relied on Congress's decision to override President Truman's veto as evidence that § 1326 was enacted in part by discriminatory animus.

Finally, Carrillo-Lopez contends that Congress's intent to discriminate against Mexicans and other Central and South Americans can be inferred from the Department of Justice's use of the word "wetback" in a letter commenting on the INA. The district court agreed. The record shows that after Senator McCarran introduced S. 716 (a revised version of S. 3455), the Senate Judiciary Committee "request[ed] the views of the Department of Justice" relating to this draft. Letter from Peyton Ford, Deputy Att'y Gen., to Sen. Pat McCarran, Chairman of the Comm. on the Judiciary (May 14, 1951). As requested, Deputy Attorney General Peyton Ford provided a comment letter. *Id.* In commenting on Sections 201 and 202, which removed racial ineligibility from the quota system, the Ford letter stated that the "Department of Justice favors the removal of racial bars to immigration." *Id.* Next, in commenting on Section 276 (the provision at issue here), the Ford letter stated that Section 276 "adds to existing law by creating a crime which will be committed if a previously deported alien is subsequently

found in the United States," and observed that "[t]his change would overcome the inadequacies in existing law which have been observed in those cases in which it is not possible for the [INS] to establish the place of reentry." *Id.* The Ford letter recommended some clarifications in the language of this section. *Id.* Finally, in commenting on Section 287 of the proposed act, which granted authority to officers of the INS to conduct searches of applicants for admission under certain circumstances, the Ford letter asked that Congress give specific authority to immigration officers to go onto private property to search for "aliens or persons believed to be aliens." *Id.* In making this suggestion, the letter quoted a 1951 "report of the President's Commission on Migratory Labor," which recommended that immigration officers be given authority to investigate private farms, in order to assist in "taking action against the conveyors and receivers of the wetback," referring to alien smugglers and employers who harbor aliens. *Id.* Carrillo-Lopez argues that this letter is probative of Congress's discriminatory intent because it refers to Mexicans as "wetback[s]," which shows an animus that Carrillo-Lopez claims should be imputed to Congress.

We reject this attenuated argument. The Ford letter's use of the term "wetback" sheds no light on Congress's views. The Ford letter quoted a separate report that employed that term when recommending that Congress clarify immigration officers' search authority to assist in enforcing the law against smugglers and persons who harbored illegal entrants.[13] And contrary to Carrillo-Lopez's argument, the

---

[13] The district court also erred in relying on the passage of an act some dubbed the "Wetback Bill" as evidence of Congress's discriminatory intent. The district court held that "both the derogatory nickname of the Wetback Bill and its criminalization of Mexican immigrant laborers while shielding employers evidence[d] the racially discriminatory

Ford letter did not recommend that Congress add a provision allowing enforcement when an alien was "found in" the United States that was then adopted by Congress. Rather, both prior drafts of the bill that became the INA included this offense; the Ford letter merely suggested clarifying language.[14] Because the Ford letter did not evince discriminatory intent, the argument that it shows Congress's discriminatory intent fails.

Given the lack of historical evidence that the Congress that enacted § 1326 in 1952 was motivated in part by a desire to discriminate against Mexicans or other Central and South

motives and intent of the same Congress who enacted Section 1326 only two months later." But individual lawmakers' name for a separate bill is not sufficient evidence to meet Carrillo-Lopez's burden of showing that Congress acted with racial animus when it enacted § 1326. Further, the district court's depiction of the act was erroneous. The act provided that any person who knowingly transports into the United States, harbors, or conceals a person in the country illegally, or encourages such a person to enter the United States, is guilty of a felony, and included a proviso that "employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring." Act of Mar. 20, 1952, Pub. L. No. 82-283, 66 Stat. 26 (1952). Based on the statement of senators in the congressional record, the act was enacted in connection with negotiations with Mexico to secure an extension of an existing migratory-labor agreement, because Mexico wanted the United States to strengthen its immigration laws to restrict migration of Mexicans to the United States. *See* 98 Cong. Rec. 791–92, 795 (1952). The act did not impose criminal penalties on Mexicans or other Central and South Americans.

[14] Thus, the district court erred in indicating that the Ford letter's "recommendation" to include a "found in" clause was adopted by Congress as "the only substantive change made to Section 1326 in 1952." Rather, the Ford letter merely suggested clarifying language for the proposed bill's "found in" clause, and as explained above, the new § 1326 made multiple changes to the 1929 Act.

Americans, Carrillo-Lopez next turns to the legislative history of a prior immigration law, the 1929 Act. The 1929 Act was one of three statutes that "imposed criminal penalties upon aliens who reentered the country after deportation." *Mendoza-Lopez*, 481 U.S. at 835. The parties do not dispute that the 1929 Act was motivated in part by racial animus against Mexicans and other Central and South Americans.

Carrillo-Lopez argues that the discriminatory purpose motivating the 1929 Act tainted the INA and § 1326 because some of the legislators were the same in 1952 as in 1929. In particular, Carrillo-Lopez observes that two of the members of Congress who had participated in enacting the 1929 Act praised the 1952 Congress for protecting American homogeneity and keeping "undesirables" away from American shores. *See* 98 Cong. Rec. 5774 (1952) (statement of Sen. George) (stating that the purpose of the 1924 immigration law was to "preserve something of the homogeneity of the American people"); *id.* at 4442 (statement of Rep. Jenkins) (stating that the House debate had "been reminiscent of the days of 20 years ago when the wishes of the Members was to keep away from our shores the thousands of undesirables just as it is their wish now"). Carrillo-Lopez also argues that the fact that the 1952 Congress did not expressly disavow the 1929 Act indicates that Congress was motivated by the same discriminatory intent. Finally, Carrillo-Lopez argues that the INA constituted a reenactment of the 1929 Act. The district court largely agreed with each of these points.

This interpretation of the legislative history is clearly erroneous. The INA was enacted 23 years after the 1929 Act, and was attributable to a legislature with "a substantially different composition," in that Congress

experienced a more than 96 percent turnover of its personnel in the intervening years. *Brnovich*, 141 S. Ct. at 2349 n.22 (citation omitted). The statements of Representative Thomas Jenkins and Senator Walter George, which in any event were made in the context of debating the national-origin quota system rather than in discussing § 1326, are not probative of the intent of the legislature as a whole. *O'Brien*, 391 U.S. at 384; *see also League of Women Voters of Fla. Inc.*, 66 F.4th at 931–32, 939.

Further, the Supreme Court has rejected the argument that a new enactment can be deemed to be tainted by the discriminatory intent motivating a prior act unless legislators expressly disavow the prior act's racism. *See Abbott*, 138 S. Ct. at 2325–26. Contrary to Carrillo-Lopez and the district court's reasoning, a legislature has no duty "to purge its predecessor's allegedly discriminatory intent." *Id*. at 2326.[15] The district court suggested that it "might be persuaded that

---

[15] Further weakening the claim that § 1326, in its current form, was motivated by discriminatory animus, is the fact that § 1326 has been amended multiple times since its enactment. *See* Pub. L. No. 100-690, § 7345, 102 Stat. 4181, 4471 (1988); Pub. L. No. 101-649, § 543, 104 Stat. 4978, 5059 (1990); Pub. L. No. 103-322, § 130001(b), 108 Stat. 1796, 2023 (1994); Pub. L. No. 104-132, § 441(a), 110 Stat. 1214, 1279 (1996); Pub. L. No. 104-208, §§ 305(b), 308(d)(4)(J), (e)(1)(K), (14)(A), 324(a), (b), 110 Stat. 3009, 3009-606, 3009-618 to 3009-620, 3009-629 (1996). Carrillo-Lopez does not allege that each successive Congress was motivated by discriminatory purpose. The district court recognized that § 1326 had been amended four times after its enactment. But based on its mistaken belief that a subsequent legislature must disavow an earlier body's discriminatory intent, the district court focused on Congress's failure to provide such a disavowal in enacting the amendments, and thus failed to recognize that "by amendment, a facially neutral provision . . . might overcome its odious origin." *Barcenas-Rumualdo*, 53 F.4th at 866 (citation omitted).

the 1952 Congress' silence alone is evidence of a failure to repudiate a racially discriminatory taint," but stopped short of reaching this issue, and such a ruling would be contrary to Supreme Court precedent.  Therefore, the evidence of the discriminatory motivation for the 1929 Act lacks probative value for determining the motivation of the legislature that enacted the INA.  *See, e.g.*, *id.* at 2325–26; *Dumas*, 64 F.3d at 1430 (examining the legislative debates of the crack cocaine criminal legislation at issue in 1986, not the legislative debates from the first law criminalizing cocaine in 1914).

Finally, the INA was not a "reenactment" of the 1929 Act, but rather a broad reformulation of the nation's immigration laws, which included a recommendation "that the time ha[d] come to erase from our statute books any discrimination against a person desiring to immigrate to this country or to become a naturalized citizen, if such discrimination [was] based solely on race."  Senate Report, at 710.  Section 1326 itself incorporated provisions from three acts and made substantial revisions and additions, H.R. 5678, 82d Cong., 2d Sess., § 276 (Apr. 28, 1952); *see supra* pp. 25–26 & n.9; *see also Mendoza-Lopez*, 481 U.S. at 835–36.  The district court therefore clearly erred in stating that § 1326 was not "substantially different" from the 1929 Act.

2

In addition to the legislative history, Carrillo-Lopez argues that § 1326's disproportionate impact on Mexicans and other Central and South Americans is evidence that Congress was motivated by a discriminatory intent in enacting the statute.  Evidence that legislation had a disproportionate impact on an identifiable group is generally not adequate to show a discriminatory motive, and here, the

evidence that § 1326 had a disparate impact on Mexicans and other Central and South Americans—and that Congress knew of this impact and enacted § 1326 because of the impact—is highly attenuated.

Carrillo-Lopez does not provide direct evidence of the impact of § 1326 on Mexicans and other Central and South Americans in the years following the 1952 enactment of the INA.    Rather, Carrillo-Lopez points to evidence that Mexicans were apprehended at the border and subject to immigration laws.  He first points to the Senate Report's statements (in a subsection on problems with deportation procedures) that "[i]n 1946 and 1947 the percentages of voluntary departures were 90 percent and 94 percent Mexicans, respectively," Senate Report, at 633, and that "[d]eportations and voluntary departures to Canada were very small, since approximately 90 percent of the cases were Mexicans," *id.* at 635 (footnote omitted).  In the same vein, the district court stated that the 1952 Congress knew that § 1326 would "disparately impact Mexican[s]" and other Central and South Americans because the Senate Report discussed "difficulties encountered in getting prosecutions and convictions, especially in the Mexican border area." While these statements indicate that Mexicans and other Central and South Americans were apprehended at the border and deported when they entered illegally, and that there was a lack of enforcement of immigration laws at the Mexican border area, the statements do not show that a statute criminalizing illegal reentry disproportionately impacted Mexicans and other Central and South Americans.[16]

---

[16] Carrillo-Lopez and the district court rely on a declaration by UCLA Professor Kelly Lytle Hernandez, which states that in the late 1930s,

Carrillo-Lopez also provides information about the current impact of § 1326. Before the district court, Carrillo-Lopez provided statistics regarding border apprehensions from 2000 to 2010, which showed that the majority of persons apprehended at the border during that period were of Mexican descent, and argued that the Department of Justice had a policy of prosecuting apprehensions. On appeal, Carrillo-Lopez cites additional information from the United States Sentencing Commission in 2020 for the proposition that 99% of prosecutions for illegal reentry are against Mexican or Central and South American defendants.[17] He also argues that in 2018, the Department of Justice's policy was to prosecute "100% of southern

---

before the enactment of the INA, "the U.S. Bureau of Prisons reported that Mexicans never comprised less than 84.6 percent of all imprisoned immigrants" and that "[s]ome years, Mexicans comprised 99 percent of immigration offenders." The declaration concludes that "[t]herefore, by the end of the 1930s, tens of thousands of Mexicans had been arrested, charged, prosecuted, and imprisoned for unlawfully entering the United States." But the declaration does not provide a source for its statements or conclusion, or any basis for the conclusion that Mexicans had been imprisoned for illegal reentry, and so provides little support for Carrillo-Lopez's claims.

[17] This statistic comes from two United States Sentencing Commission "Quick Facts" sheets, which state "99.1% of illegal reentry offenders were Hispanic" in fiscal year 2020, and "99.0% of illegal reentry offenders were Hispanic" in fiscal year 2019. U.S. Sent'g Comm'n, *Quick Facts: Illegal Reentry Offenses, Fiscal Year 2020*, at 1 (May 2021), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY20.pdf; U.S. Sent'g Comm'n, *Quick Facts: Illegal Reentry Offenses, Fiscal Year 2019*, at 1 (May 2020), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY19.pdf.

border crossings."**[18]**   This data has little probative value, however, because it relates to a period that is more than 45 years after the INA was enacted.  After such a long passage of time, this information does not raise the inference that Congress enacted § 1326 in 1952 because of its impact on Mexicans and other Central and South Americans.  *See, e.g.*, *McCleskey*, 481 U.S. at 298 n.20; *Johnson*, 405 F.3d at 1222 n.17.  The district court's reliance on this contemporaneous data was clearly erroneous.

But even if Carrillo-Lopez had provided direct evidence that § 1326 had a disproportionate impact on Mexicans and other Central and South Americans in the years following the enactment of the INA, he would still not carry his burden of showing that Congress enacted § 1326 because of its impact on this group, because the clear geographic reason for disproportionate impact on Mexicans and other Central and South Americans undermines any inference of discriminatory motive.  "The United States' border with Mexico extends for 1,900 miles, and every day thousands of persons . . . enter this country at ports of entry on the southern border."  *Hernandez v. Mesa*, 140 S. Ct. 735, 746 (2020).  Therefore, it is "common sense . . . that it would be substantially more difficult for an alien removed to China to return to the United States than for an alien removed to

---

[18] This statement does not appear to be correct, as it refers to a press release announcing "a new 'zero-tolerance policy' for offenses under 8 U.S.C. § 1325(a)."  Off. of Pub. Affs., Dep't of Just., *Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry* (Apr. 6, 2018), https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry.   Section 1325 relates to improper entry by an alien.  The press release does not indicate a policy of prosecuting "100% of southern border crossings," as Carrillo-Lopez contends.

Mexico to do so."  *United States v. Arenas-Ortiz*, 339 F.3d 1066, 1070 (9th Cir. 2003).  The Court has explained that "because Latinos make up a large share of the unauthorized alien population," *Regents*, 140 S. Ct. at 1915, "virtually any generally applicable immigration policy could be challenged on equal protection grounds" if disproportionate impact were sufficient to state a claim, *id.* at 1916.  Therefore, the claim that a law has a "disparate impact . . . on Latinos from Mexico" is not "sufficient to state" a "plausible equal protection claim."  *Id.* at 1915–16.  Applied here, the fact that § 1326, which criminalizes reentry, has a greater impact on the individuals who share a border with the United States, and "make up a large share of the unauthorized alien population," *id.* at 1915, than those who do not, does not prove that penalizing such individuals was a purpose of this legislation.[19]  The district court clearly erred when it relied on the evidence of disproportionate impact without further evidence demonstrating that racial animus was a motivating factor in the passage of the INA.

---

[19] The district court stated it was "unpersuaded by the government's argument that geography explains [§ 1326's] disparate impact" because a group can raise an equal protection challenge against legislation that has a disproportionate impact on a racial group even when "'geography' might arguably explain the disparity."  To the extent the district court meant that a group may succeed on such a claim merely because the challenged legislation "bears more heavily on" one race than another, it was incorrect.  The Supreme Court has made clear that a group may raise an equal protection claim only if a discriminatory purpose was a motivating factor for the legislation, *see Arlington Heights*, 429 U.S. at 265, and evidence that a disproportionate impact was not "because of" a discriminatory purpose may defeat the claim, *Feeney*, 442 U.S. at 279.

### 3

We hold that the district court clearly erred in its finding that Congress's enactment of § 1326 was motivated in part by the purpose of discriminating against Mexicans or other Central and South Americans.  The strong "presumption of good faith" on the part of the 1952 Congress is central to our analysis.  *Miller*, 515 U.S. at 916.  Rather than applying this presumption, the district court construed evidence in a light unfavorable to Congress, including finding that evidence unrelated to § 1326 indicated that Congress enacted § 1326 due to discriminatory animus against Mexicans and other Central and South Americans.  The district court also erred in finding that Congress's failure "to repudiate the racial animus clearly present in 1929" was indicative of Congress's discriminatory motive in enacting the INA.

We conclude that Carrillo-Lopez did not meet his burden to prove that Congress enacted § 1326 because of discriminatory animus against Mexicans or other Central and South Americans.  "This conclusion ends the constitutional inquiry," *Arlington Heights*, 429 U.S. at 267, and we reject Carrillo-Lopez's equal protection claim.  In reaching this conclusion, we join the Fifth Circuit, which in a case raising substantially identical arguments and relying on the same evidence, held that the evidence was "insufficient to establish that Congress enacted § 1326 with racial animus." *Barcenas-Rumualdo*, 53 F.4th at 866–67.

**REVERSED AND REMANDED.**