**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 23-1418

———————

UNITED STATES OF AMERICA

v.

JUNIOR GONZALEZ-NANE,
Appellant

———————

On Appeal from the United States District Court
For the Middle District of Pennsylvania
(District Court No. 1-21-cr-00197-001)
District Judge:  Honorable Christopher C. Conner

———————

Submitted Pursuant to Third Circuit L.A.R. 34.1(a) on June 5, 2024

———————

Before:  CHAGARES, <u>Chief Judge</u>, CHUNG, and FISHER, <u>Circuit Judges</u>

(Filed: July 17, 2024)

———————

OPINION[1]

———————

CHUNG, <u>Circuit Judge</u>.

In July 2021, Defendant Junior Gonzalez-Nane was indicted for illegally

---

[1]     This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

reentering the United States after being previously removed in violation of 8 U.S.C.

§ 1326(a). He pleaded not guilty and moved to dismiss the Indictment on the basis that §

1326 violates the Fifth Amendment's equal protection guarantee. The District Court

denied the motion and Gonzalez-Nane entered a conditional guilty plea reserving his

right to appeal. Gonzalez-Nane now appeals from the District Court's denial of his

motion to dismiss. Because we agree with the District Court that Gonzalez-Nane has not

met his burden of proving that § 1326 was enacted with the intent to discriminate against

Mexicans and other Latinos, we will affirm.

I.      Background[2]

Section 1326 is violated any time a noncitizen who "has been denied admission,

excluded, deported, or removed [from] … the United States … thereafter … enters,

attempts to enter, or is at any time found in, the United States." 8 U.S.C. § 1326(a). It

was enacted in 1952 as Section 276 of the Immigration and Nationality Act ("INA"),[3] a

comprehensive legislative scheme that overhauled the country's existing immigration

---

[2]      Because we write for the parties, we recite only facts pertinent to our decision.

[3]      Section 276 was subsequently codified as 8 U.S.C. § 1326. Since its enactment,
§ 1326 has been amended several times, most recently in 1996. See Pub. L. No. 100-690,
§ 7345, 102 Stat. 4181, 4471 (1988); Pub. L. No. 101-649, § 543, 104 Stat. 4978, 5059
(1990); Pub. L. No. 103-322, § 130001(b), 108 Stat. 1796, 2023 (1994); Pub. L. No. 104-
132, § 441(a), 110 Stat. 1214, 1279 (1996); Pub. L. No. 104-208, §§ 305(b), 308(d)(4)(J),
(e)(1)(K), (14)(A), 324(a), (b), 110 Stat. 3009, 3009-606, 3009-618 to 3009-620, 3009-
629 (1996).

framework. Immigration and Nationality Act, Pub. L. No. 82-414, § 276, 66 Stat. 163, 229 (1952).

Section 1326 replaced three previous laws that similarly prescribed criminal penalties for various reentry offenses. See United States v. Mendoza-Lopez, 481 U.S. 828, 835 (1987); United States v. Carrillo-Lopez, 68 F.4th 1133, 1147 (9th Cir. 2023), cert. denied, 144 S. Ct. 703 (2024). One of those three statutes, known as the 1929 Act, is central to Gonzalez-Nane's appeal. See Act of March 4, 1929, Pub. L. No. 70-1018, 45 Stat. 1551 (1929). Like § 1326, the 1929 Act made it a felony for non-citizens who were previously deported to reenter or attempt to reenter the United States. Congress passed the 1929 Act at a time when racial animus against Latinos was rampant, including among members of Congress. The District Court agreed with Gonzalez-Nane—and the Government does not contest—that when Congress passed the 1929 Act, it "was motivated by racial and ethnic animus directed towards Latinos, particularly citizens of Mexico." App. 581.

Against this historical backdrop, Gonzalez-Nane moved to dismiss his Indictment, arguing that § 1326 is facially invalid under the Fifth Amendment's Equal Protection Clause because, like one of its predecessors, Congress enacted it in with the intent to discriminate against undocumented individuals from Mexico and other Central and South American countries. Though the District Court agreed that § 1326 disproportionately affects this population, it denied Gonzalez-Nane's motion to dismiss, concluding that he failed to demonstrate that Congress intended to discriminate against Latinos in violation of the Equal Protection Clause when enacting the statute.

3

II.  DISCUSSION[4]

The Fifth Amendment prohibits "depriv[ations] of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  Like the Due Process Clause of the Fourteenth Amendment, "the Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups."[5]  Washington v. Davis, 426 U.S. 229, 239 (1976).  This protection applies equally to laws that explicitly discriminate on the basis of race and those that are motivated by a discriminatory purpose, despite being race-neutral on their face.  Vill. of Arlington Heights v. Metro Hous. Dev. Corp., 429 U.S. 252, 265-66 (1977); see also N.C. State Conf. of NAACP v. McCrory, 831 F.3d 204, 220 (4th Cir. 2016) ("If discriminatorily motivated, such laws are just as abhorrent, and just as unconstitutional, as laws that expressly discriminate on the basis of race.").

"Proof of racially discriminatory intent or purpose is required to" prove an equal protection violation.  Arlington Heights, 429 U.S. at 265.[6]  Even when challenging a

---

[4]  The District Court had jurisdiction under 18 U.S.C. § 3231.  This Court has jurisdiction under 28 U.S.C. § 1291.  We review challenges to the constitutionality of a criminal statute de novo.  United States v. Hoffert, 949 F.3d 782, 787 (3d Cir. 2020).  We review the District Court's factual findings for clear error.  United States v. Menendez, 831 F.3d 155, 164 (3d Cir. 2016).

[5]  Our analysis of "Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment."  Weinberger v. Wiesenfeld, 420 U.S. 636, 638 n.2 (1975).

[6]  The government argues that the Arlington Heights standard is inapplicable and that, because § 1326 is immigration-related legislation, we must apply rational basis review.  We need not decide this question, however, because Gonzalez-Nane has failed to meet his burden even under the more stringent Arlington Heights framework.

statute or rule that is race-neutral on its face, a plaintiff must demonstrate that "a discriminatory purpose has been a motivating factor in the decision." Id. at 265–66. In Arlington Heights, the Supreme Court explained that, in most cases, evidence of a racially disproportionate impact—proof that a rule "bears more heavily on one race than another," id. at 266 (quoting Washington, 426 U.S. at 242)—is not itself sufficient to demonstrate racially discriminatory purpose, though it is "an important starting point." Id. Except in rare cases, a plaintiff must introduce additional evidence demonstrating that "the decisionmaker … selected or reaffirmed a particular course of action at least in part 'because of,' not merely in 'spite of,' its adverse effects upon an identifiable group." Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979); see also Arlington Heights, 429 U.S. at 264–65 ("[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact … Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."). Such evidence includes the historical background of the challenged rule, "[t]he specific sequence of events leading up to" its passage, "[d]epartures from the normal procedural sequence" in the rule's passage, and its "legislative or administrative history." Arlington Heights, 429 U.S. at 267–68. "This evidence must be considered in light of the strong 'presumption of good faith' on the part of legislators." Carrillo-Lopez, 68 F.4th at 1140 (quoting Miller v. Johnson, 515 U.S. 900, 916 (1995)).

Section 1326 is a facially race-neutral statute. In arguing that § 1326 discriminates against Latinos in purpose and effect, Gonzalez-Nane primarily emphasizes (1) its historical background and the events leading up to its passage, including preceding

immigration-related legislation and INA-related remarks made by influential political figures; and (2) its legislative history, namely Congress's enactment of the INA over President Truman's veto. This evidence is insufficient to support Gonzalez-Nane's argument that § 1326 was enacted with the intent to discriminate. Thus, we join the other courts of appeals that have addressed the very claim that Gonzalez-Nane raises here, all of which have rejected criminal defendants' equal protection challenges to § 1326. United States v. Amador-Bonilla, 102 F.4th 1110,1119 (10th Cir. 2024); United States v. Sanchez-Garcia, 98 F.4th 90, 97 (4th Cir. 2024); Carrillo-Lopez, 68 F.4th at 1138; United States v. Barcenas-Rumualdo, 53 F.4th 859, 867 (5th Cir. 2022).

The evidence Gonzalez-Nane offers of discriminatory motivations is lacking. He points to a letter written by Deputy Attorney General Peyton Ford ("the Ford Letter"), who responded to a Senate Judiciary Committee request for the Department of Justice's views on a draft of the INA. Gonzalez-Nane specifically relies on Ford's use of a slur when commenting on a different section of the INA that is not at issue here. In making suggestions for that provision, Ford quoted the "report of the President's Commission on Migratory Labor," which in turn recommended that immigration officials be allowed to enter private property believed to be harboring noncitizens to "aid in taking action against the conveyors and receivers of the wetback." App. 523.

Like the other courts of appeal that have considered this evidence, we condemn the use of the racist slur. We do not, however, find it sufficient to establish a congressional intent to discriminate in passing § 1326. Ford's use of the slur appears in response to a different provision of the INA. Ford's comments about § 1326 itself were

6

minimal and limited to "suggest[ions] … for clarity." App. 521. Moreover, while the clarifying language suggested by Ford was included, Ford was not a member of Congress. Mixed incentives generally motivate legislation, and there is no evidence that members of Congress approved of Ford's use of the slur or that they were motivated by his underlying views in passing § 1326. Thus, the Ford Letter "sheds no light on Congress's views" and offers no support for the argument that § 1326 was enacted with an intent to discriminate against Latinos. Carrillo-Lopez, 68 F.4th at 1149.

Gonzalez-Nane also relies on other third-party statements as evidence of Congress's allegedly discriminatory intent. Specifically, he explains that President Truman vetoed the INA because he opposed its use of a national-origin quota system, which limited "the number of persons from [certain] … nation[s] who could enter the United States for permanent residence … ." Carrillo-Lopez, 68 F.4th at 1144. Congress enacted the INA over President Truman's veto, which Gonzalez-Nane argues is evidence of its discriminatory intent in passing § 1326 because President Truman's veto statement "explicitly called out the INA's racism." App. 66. This argument is unpersuasive for two reasons. First, President Truman's veto was based on his concerns about the disparate impact of a national-origin quota system—a different INA provision—on Eastern and Southern Europeans and does not bear on "whether Congress had an invidious intent to discriminate against Mexicans and other Central and South Americans in enacting § 1326."[7] Carrillo-Lopez, 68 F.4th at 1148. Second, we agree with the Ninth

_____

[7] President Truman's veto statement did not mention § 1326.

Circuit that "President Truman's opinion on the legislation is not evidence of *Congress's* motivation in enacting § 1326." Id. (emphasis added).

Gonzalez-Nane next focuses on § 1326's historical background, which "center[s] almost entirely on a different law"—the 1929 Act. Sanchez-Garcia, 98 F.4th at 99. It is undisputed by the parties that the 1929 Act was motivated by racial animus and the history Gonzalez-Nane recounts "paints a vivid picture of [its] troubling history." Barcenas-Rumualdo, 53 F.4th at 866; see also Sanchez-Garcia, 98 F.4th at 99 (assuming "that the 1929 Act rests at least in part on underlying racist motivations") (quotations omitted)). The Supreme Court has held, however, that evidence of "[p]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." Abbott v. Perez, 585 U.S. 579, 603 (2018) (quoting City of Mobile v. Bolden, 446 U.S. 55, 74 (1980) (plurality opinion)). Thus, "to the extent [that Gonzalez-Nane] argue[s] that the motivations for the 1929 Act may automatically be imputed to the 1952 Congress—at least without some repudiation by that Congress—we must disagree." Sanchez-Garcia, 98 F.4th at 99 (quotations omitted).

This is not to say that the 1929 Act is wholly irrelevant in scrutinizing § 1326. See id. ("[A] prior legislature's discriminatory intent is appropriately considered as part of the Arlington Heights historical background factor.") (quotations omitted)). However, evidence of past discrimination must accompany evidence of the enacting legislature's intent, buttressing that broader narrative of discriminatory purpose; it cannot stand alone. Here, "the intent behind the 1929 Act is of limited probative force when it comes to the intent of 1952's Congress in passing § 1326," id. at 99–100, because "[t]he INA was

8

enacted 23 years after the 1929 Act … [by] a legislature with a substantially different composition, in that Congress experienced a more than 96 percent turnover of its personnel in the intervening years." Carrillo-Lopez, 68 F.4th at 1150 (quotations omitted). This lapse of time and personnel turnover attenuates the intent behind § 1326 from the motivation in passing the 1929 Act. See Sanchez-Garcia, 98 F.4th at 99–100; Carrillo-Lopez, 68 F.4th at 1151.

Gonzalez-Nane attempts to bridge this twenty-three-year gap by arguing that § 1326 simply "reenacted without debate the 1929 criminal reentry statute." Opening Br. 17 (emphasis omitted). This argument fails to acknowledge that "the INA was not a 'reenactment' of the 1929 Act, but rather a broad reformulation of the nation's immigration laws." Carrillo-Lopez, 68 F.4th at 1151. "[I]f we narrow our focus to § 1326 itself, that provision had three predecessor statutes, not [just the 1929 Act], and incorporated from each of them while making substantial revisions and additions." Sanchez-Garcia, 98 F.4th at 100. Further, the congressional debates about the INA "did not mention the illegal reentry provision" or discuss § 1326's "impact on Mexicans or other Central and South Americans," cutting against Gonzalez-Nane's position here. Carrillo-Lopez, 68 F.4th at 1146. Rather than "suggest[ing] an acceptance of [§ 1326]'s racist history," as Gonzalez-Nane argued in his motion to dismiss, this lack of debate is weak evidence of discriminatory intent as it could also be read to reflect that Congress was not concerned with, and hence not motivated to discriminate against, a particular racial or ethnic group. App. 68

9

Gonzalez-Nane also points to certain events immediately preceding its enactment to support an inference of discriminatory intent in passing § 1326. He primarily cites comments associated with Senate Bill 1851, which some members of Congress crudely dubbed the "Wetback Bill." See Act of Mar. 20, 1952, Pub. L. No. 82-283, 66 Stat. 26 (1952).[8] Senate Bill 1851 was enacted approximately three months before the INA and was "an anti-harboring law targeting those involved in transporting and otherwise facilitating the entry of non-citizens into the United States without authorization." Sanchez-Garcia, 98 F.4th at 101. We agree that the Bill's "noxious formulation," id., evinces discriminatory intent by some members of Congress. However, as discussed above, any discriminatory purpose that motivated individual lawmakers in passing Senate Bill 1851 is only relevant to the extent that Gonzalez-Nane can demonstrate that Congress had the same motivations in enacting § 1326. Gonzalez-Nane has not offered any such evidence, and thus, as with the Act of 1929, he fails to connect Congress's motivations behind § 1326 to the passage of Senate Bill 1851.

Gonzalez-Nane's effort to demonstrate § 1326's discriminatory purpose through its disparate impact on Latinos fares no better. Gonzalez-Nane relies almost exclusively on data from the Department of Justice that ninety-nine percent of illegal reentry offenders were Hispanic in fiscal years 2020, 2021, and 2022. "[T]here is nothing surprising—or more to the point, suspicious—about the fact that an illegal reentry

---

[8]    The act made it a felony to knowingly transport, harbor, or conceal individuals who entered the country illegally.  It exempted employers from its restrictions and it did not impose criminal penalties on violators.

provision bears most heavily on populations with whom this country shares a several-thousand-mile border." Sanchez-Garcia, 98 F.4th at 102. Because Gonzalez-Nane fails to offer data or other evidence that would counter the "obvious explanation for th[e] disparate impact" he highlights, his disparate impact evidence "does little, if anything, to suggest a racially discriminatory motive." Id.

III.     CONCLUSION

The evidence that Gonzalez-Nane relies on fails to support an inference that Congress intended to discriminate against Latinos when enacting § 1326. We will therefore affirm the District Court's judgment denying Gonzalez-Nane's motion to dismiss his indictment.

11