In the

# United States Court of Appeals

## For the Seventh Circuit

No. 22-3285

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ALFREDO VIVEROS-CHAVEZ,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:21-cr-00665 — **Matthew F. Kennelly**, *Judge.*

ARGUED SEPTEMBER 27, 2023 — DECIDED AUGUST 15, 2024

Before SYKES, *Chief Judge*, and FLAUM and LEE, *Circuit Judges*.

LEE, *Circuit Judge*. Alfredo Viveros-Chavez, a Mexican citizen who had previously been removed from the United States, was found again in the country without lawful immigration status. The government charged him with violating 8 U.S.C. § 1326, which forbids noncitizens from reentering the United States without authorization. Seeking to dismiss the indictment, Viveros-Chavez argued that § 1326 violates the

Fifth Amendment's guarantee of equal protection because it was enacted with discriminatory intent and disproportionately impacts Mexican and Latino individuals. The district court disagreed, finding insufficient evidence that racial animus motivated the statute's enactment. Viveros-Chavez appeals, contesting the district court's reading of the statute's history. For the reasons below, we affirm.

## I.  Background

Viveros-Chavez, a Mexican citizen without legal status in the United States, was arrested in 2019 and convicted of felony aggravated robbery in Cook County, Illinois. Because he had already been removed from the United States twice before, he was charged with unlawful reentry in violation of 8 U.S.C. § 1326(a). Viveros-Chavez moved to dismiss the indictment, claiming that the statute violates the Fifth Amendment. In support, Viveros-Chavez argued that § 1326, which was enacted as part of the Immigration and Nationality Act (INA) in 1952, was incurably tainted by the racist sentiments that led to the passage of its predecessor, the Undesirable Aliens Act of 1929 (UAA), the first federal law to ban reentry.[1] He also presented data that, he claimed, demonstrated the statute's enforcement disproportionately impacted Mexicans and Latinos.

The district court denied the motion. In doing so, the court applied the discriminatory-intent framework the Supreme

---

[1] Since Congress enacted the INA, the relevant provision has undergone numerous amendments, the substance of which are not relevant to this appeal. *See United States v. Sanchez-Garcia*, 98 F.4th 90, 95 n.2 (4th Cir. 2024) (describing amendments). For ease of reference, we will refer to the UAA by its name and the provision contained in the INA as § 1326.

Court articulated in *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), rather than rational basis review (which the government favored). The court then considered the circumstances surrounding the enactment of the UAA as well as § 1326.

Ultimately, the district court agreed with Viveros-Chavez that the passage of the UAA was motivated by racial animus. However, it found little evidence that racial targeting was behind the enactment of § 1326. And, to the extent that certain legislators had expressed racially derogatory statements around the time of § 1326's enactment, the court concluded that the isolated comments did not speak to Congress's overall intent in passing the law. Finally, the district court was unpersuaded by Viveros-Chavez's statistical analysis, noting the lack of any evidence that the government targeted Mexican and Latino individuals for illegal reentry prosecutions at a disproportionate rate.

After the adverse ruling, Viveros-Chavez entered a conditional guilty plea pursuant to Federal Rule of Criminal Procedure 11(a)(2), preserving his right to appeal the denial of his motion to dismiss. This appeal followed.

## II. Standard of Review

We review a district court's decision on the constitutionality of a criminal statute *de novo*. *United States v. Bass*, 325 F.3d 847, 849 (7th Cir. 2003). And we review findings of fact incident to that determination for clear error. *Abbott v. Perez*, 585 U.S. 579, 607 (2018); *United States v. Boyce*, 742 F.3d 792, 794 (7th Cir. 2014).

### III. Analysis

The Fifth Amendment provides that no person should be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Although not explicit in the text, the Supreme Court has construed the amendment to "contain[] an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976). A law that explicitly discriminates on the basis of race is "subjected to the strictest scrutiny and [is] justifiable only by the weightiest of considerations." *Id.* at 242. Similarly, a facially neutral law fails constitutional muster if "there is proof that a discriminatory purpose has been a motivating factor" in its enactment. *Arlington Heights*, 429 U.S. at 267.

Viveros-Chavez argues that § 1326 is unconstitutional because it discriminates against Mexican and Latino individuals in violation of the equal protection guarantee of the Fifth Amendment. In support, he points to congressional statements leading to the 1929 passage of the UAA, events surrounding the 1952 enactment of the INA, and statistics indicating that Mexicans and Latinos comprise the vast majority of individuals charged with illegal reentry under § 1326.

Our analysis proceeds as follows. First, we consider the proper deference to afford Congress when reviewing the constitutionality of § 1326, which in turn determines the scope of our review. Next, we discuss the history surrounding the enactment of the UAA and the relevance of that history to § 1326. Finally, we evaluate the constitutionality of § 1326 itself. In doing so, we consider § 1326's legislative history and examine whether the district court erred in rejecting Viveros-Chavez's disparate impact evidence.

In the end, we join our sister circuits in concluding that § 1326 does not violate the Fifth Amendment's guarantee of equal protection. *See, e.g.*, *United States v. Barcenas-Rumualdo*, 53 F.4th 859, 862 (5th Cir. 2022); *United States v. Carrillo-Lopez*, 68 F.4th 1133, 1138 (9th Cir. 2023); *United States v. Wence*, No. 22-2618, 2023 WL 5739844, at *1 (3d Cir. Sept. 6, 2023); *Sanchez-Garcia*, 98 F.4th at 94.

### A. Deference to Congress

The parties first dispute the proper deference to afford Congress when examining the constitutionality of § 1326. The government urges us to evaluate the law under rational basis review because the statute concerns immigration, an area where courts typically defer to the political branches. *See, e.g.*, *Mathews v. Diaz*, 426 U.S. 67, 82 (1976) (noting that courts should apply a "narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization"). By contrast, Viveros-Chavez argues that we should consider the statute under the test the Supreme Court established in *Arlington Heights*, which, he points out, the Court has utilized recently in the immigration setting. *See, e.g.*, *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 34–35 (2020).

There is something to be said for both positions. Section 1326 penalizes unlawful entry into the country, and Congress rightly deserves deference to make decisions concerning the matriculation of noncitizens. On the other hand, § 1326 is not an immigration statute *per se* because it says nothing about who gets admitted or deported. It is perhaps better viewed as a criminal statute that affects the rights of those persons found and prosecuted within the United States.

For present purposes, we will assume that the less-deferential and more rigorous *Arlington Heights* standard applies, because if § 1326 overcomes this hurdle, it would certainly survive rational basis review. *See, e.g.*, *Sanchez-Garcia*, 98 F.4th at 98 ("[W]e can leave for another day a definitive resolution of the standard of review question and proceed to an analysis under the familiar *Arlington Heights* framework.").

## B. The 1929 UAA

Viveros-Chavez's primary argument on appeal is that the district court erred by discounting the racial animus underpinning the 1929 passage of the UAA. Citing the Supreme Court's decision in *Abbott*, Viveros-Chavez asserts that whatever racial animus motivated the enactment of the UAA should also be imputed to the passage of § 1326. This is so, he contends, because the discriminatory intent behind a preceding law should carry over to its successor unless Congress engages in a deliberative process to remove the "taint" of racial animus.

That the legislative history of the UAA contains many statements denigrating Mexicans is beyond dispute. The legislation itself was meant to be a compromise between hardline nativists, who wanted to exclude Mexican immigrants entirely, and business interests in the agricultural, mining, and construction industries in need of Mexican labor. *See* Decl. of Prof. Benjamin Gonzalez O'Brien (ECF No. 24-2) at 11; *see also* David Gutierrez, *Walls and Mirrors: Mexican Americans, Mexican Immigrants, and the Politics of Ethnicity* 40, 43 (1995). This tension is reflected in the congressional record. During the floor debate, for example, one congressman stated that Mexican immigrants were "poisoning the American citizen" because they are "of a class" that is "very undesirable." 70 Cong.

Rec. 3619–20 (1929) (statement of Rep. Fitzgerald). And another complained that Mexican immigrants were entering the country in "hordes." 70 Cong. Rec. 3619 (1929) (statement of Rep. Blanton); *see also United States v. Calvillo-Diaz*, No. 21-CR-445, 2022 WL 1607525, at *6 (N.D. Ill. May 20, 2022) (discussing evidence of discriminatory intent pertaining to the UAA).

But it is no small thing to find that a law duly enacted by Congress was motivated by racial animus. And "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266; *see United States v. O'Brien*, 391 U.S. 367, 383 (1968) (observing that "[i]nquiries into congressional motives or purposes are a hazardous matter"). Moreover, we keep in mind that the statements of one or two legislators without more may not be probative of the intent of the entire body. *See O'Brien*, 391 U.S. at 384 ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork.").

Here, the evidence certainly suggests that racial antipathy animated much of the debate in 1929. And, where it is necessary for a court to make a finding of racial animus (or the lack thereof) on the part of a legislature to resolve a claim, it should not hesitate to do so after carefully considering the evidence in fulfillment of its constitutional responsibility. *See, e.g.*, *Hunter v. Underwood*, 471 U.S. 222 (1985). But, for reasons that will become plain, that is not the case here.

And so, we proceed by assuming for argument's sake that the passage of the UAA was motivated by racial animus towards Mexican and Latino immigrants. But the pertinent

question is this: how relevant are the statements in 1929 to the enactment of the INA in 1952? To Viveros-Chavez, they matter a great deal. But we are not persuaded.

Consider Viveros-Chavez's reliance on *Abbott*. That case involved a challenge to a Texas redistricting plan. *Abbott*, 585 U.S. at 585. The legislature had enacted one in 2011, but the plan was immediately challenged as being racially discriminatory. *Id.* at 587. While the litigation was pending, the legislature adopted a new redistricting plan in 2013. *Id.* at 588. A three-judge panel found the new plan unconstitutional, concluding that the legislature had failed to purge the discriminatory "taint" that allegedly had animated the passage of the 2011 plan. *Id.* at 592.

Overturning the panel, the Supreme Court expressly rejected the conclusion Viveros-Chavez asks us to reach. *See* W. Kerrel Murray, *Discriminatory Taint*, 135 Harv. L. Rev. 1190, 1204 (2022) (noting that the *Abbott* Court "blasted the idea that 'taint' associated with Texas's 2011 redistricting maps determined the validity of 2013 maps based (in part) on the 2011 maps"). In doing so, the Court held that a state legislature is entitled to a "presumption of legislative good faith" when redistricting, and challengers must show that the enacting body "acted with invidious intent." *Abbott*, 585 U.S. at 603, 605. The actions of a previous legislature may be relevant "to the extent that they naturally give rise to—or tend to refute—inferences regarding the intent of the [enacting legislature]," but it is just "one evidentiary source relevant to the question of intent." *Id.* at 607. What counts is the motivation of the legislature that passed the law in question.

Despite this, Viveros-Chavez directs us to three Supreme Court cases to support his theory that the discriminatory

purpose behind a law must be imputed wholesale to a successor statute—*Hunter*, 471 U.S. at 229; *Ramos v. Louisiana*, 590 U.S. 83 (2020); and *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464 (2020). But none of these cases help him.

In *Hunter*, the Supreme Court considered the constitutionality of a provision in the Alabama Constitution that disfranchised persons convicted of crimes involving moral turpitude. 471 U.S. at 225. Even though the provision was racially neutral (other courts had already voided some of the more "blatantly discriminatory" sections, such as one concerning miscegenation), the Supreme Court held that the "original enactment was motivated by a desire to discriminate against blacks on account of race" and thus violated the Fourteenth Amendment's Equal Protection Clause under *Arlington Heights*. *Id.* at 233.

Seeking to come within *Hunter*'s ambit, Viveros-Chavez argues that Congress in 1952 "explicitly intended to keep [the UAA] with discrete technical modifications." As a result, he continues, the 1952 Congress merely recodified the UAA as § 1326 with only minor modifications. And where a statute was motivated by racial animus, he concludes, *Hunter* requires that its subsequent iterations be diagnosed with the same malady.

This misreads *Hunter*. The constitutional provision in question there had remained unchanged from its ratification. Certainly, other portions of the applicable section had been nullified by courts on constitutional grounds, but the Supreme Court trained its gaze on the intent of the constitutional convention that adopted the provision at issue.

*Ramos* is similarly unavailing. In that case, the Supreme Court considered a challenge to provisions in the Louisiana and Oregon constitutions that permitted nonunanimous jury verdicts for serious crimes. 590 U.S. at 88. In finding that these sections violated the Sixth Amendment, the Court abrogated a prior decision that had blessed these provisions. *See Apodaca v. Oregon*, 406 U.S. 404 (1972). It did so because, among other things, *Apodaca* failed to consider "the racially discriminatory reasons that Louisiana and Oregon adopted their peculiar rules in the first place." *Ramos*, 590 U.S. at 99 (emphasis removed). Seizing on this language, Viveros-Chavez argues that the original sin of racial animus cannot be washed away by recodifying a law.

But the Supreme Court in *Ramos* was primarily concerned with *Apodaca*'s functionalist approach to constitutional analysis and its perfunctory acceptance of the benefits of nonunanimous verdicts without any acknowledgement of the downfalls. *Id.* at 100. Nothing in *Ramos* suggests that the racial animus of one legislature must be imputed to the next.

Similarly, *Espinoza* offers Viveros-Chavez no assistance. There, the Supreme Court considered a Montana constitutional provision that barred government funding for religious schools. *Espinoza*, 591 U.S. at 482. While the opinion acknowledged that similar state "no-aid" provisions arose from a "checkered tradition," the Court did so only as part of its discussion regarding the history of the Free Exercise Clause. *Id.*

Aside from these cases, Viveros-Chavez's wholesale-imputation theory falls short for a separate reason—§ 1326 was not a mere recodification of the UAA as he suggests. First, § 1326 was intended to replace the reentry proscriptions contained in three separate statutes. *See Carrillo-Lopez*, 68 F.4th at

1147 n.9 (quoting *United States v. Mendoza-Lopez*, 481 U.S. 828, 835 (1987)). Furthermore, as the district court aptly observed, there are material differences between § 1326 and the UAA. For example, the UAA prohibited reentry only for individuals who had been deported from the United States. *See* Act of Mar. 4, 1929, Pub. L. No. 70-1018, 45 Stat. 1551. In comparison, Congress expanded the law to encompass noncitizens who had been "denied admission" prior to entering the United States. 8 U.S.C. § 1326(a). The new law also added language permitting prosecutors to charge immigrants "found in" the United States, rather than those who just attempted to reenter. *Id.* § 1326(b); *compare* Act of Mar. 4, 1929, Pub. L. No. 70-1018, 45 Stat. 1551 (imposing a felony on individuals who had been "arrested and deported" and then later "enter[] or attempt[] to enter" the country), *with* 8 U.S.C. § 1326 (criminalizing when an individual who has previously been denied admission or deported later "enters, attempts to enter, or is at any time found in, the United States"). This made it easier for the government to identify the proper forum to prosecute alleged violators. In addition, § 1326(b) permitted a noncitizen to reenter the country by obtaining the Attorney General's written consent in advance. *Id.*

These significant changes reflect the fact that the INA was not a mere recodification of the UAA's statutory scheme, but a "broad reformulation of the nation's immigration laws." *Carrillo-Lopez*, 68 F.4th at 1151. Thus, while the racial motivations of the 1929 legislature may be a relevant data point, the sheer breadth and purpose of the INA severely undercut the notion that the legislative motivations in 1929 should be imported fully to 1952.

### C. Section 1326's Constitutionality

We have assumed that *Arlington Heights* governs Viveros-Chavez's constitutional claims and have determined that the legislative motivations in 1929 may be relevant to his claim but are not dispositive. We now consider § 1326 itself.

As noted, when challenging a law for violating equal protection, the plaintiff bears the burden of demonstrating that "discriminatory purpose was a motivating factor" in the challenged action's passage. *Arlington Heights*, 429 U.S. at 266. In assessing such a claim, a court must conduct a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id*. Relevant evidence includes the historical background of the law's enactment, the events leading up to the enactment, the legislative history, and any procedural or substantive departures from the normal legislative process. *See id.* at 267–68. Moreover, whether the legislation in question "bears more heavily on one race than another," *Davis*, 426 U.S. at 242, is an "important starting point," but "impact alone is not determinative." *Arlington Heights*, 429 U.S. at 266.

Here, the district court made certain findings regarding the evidence and Congress's motivations underlying § 1326. The parties disagree as to the appropriate standard of review for these conclusions. The government believes that the question of motivation is purely factual and the district court's finding should only be reversed for clear error. Viveros-Chavez, however, points to our decision in *United States v. D.F.* and contends that "the ultimate question of whether [historical] facts satisfy the relevant standard [is] a mixed question of fact and law that ought to be subject to independent appellate review." 115 F.3d 413, 415 (7th Cir. 1997).

The government has the better argument. In *Abbott*, the Supreme Court stated unequivocally that "a district court's finding of fact on the question of discriminatory intent is reviewed for clear error." 585 U.S. at 607. Our decision in *D.F.* not only predates *Abbott*, but it concerns the standard of review when a district court determines that certain facts satisfy a particular legal standard, *i.e.*, a mixed question of fact and law. S*ee D.F.*, 115 F.3d at 415. Such is not the case here. Indeed, every appellate court to have considered the constitutionality of § 1326 has applied clear error when reviewing a district court's finding regarding racial animus. *See, e.g., Carrillo-Lopez*, 68 F.4th at 1153 ("We hold that the district court clearly erred in its finding that Congress's enactment of § 1326 was motivated in part by the purpose of discriminating against Mexicans or other Central and South Americans."); *Sanchez-Garcia*, 98 F.4th at 97 ("We review the district court's factual findings – including its findings as to whether § 1326 is motivated by a racially discriminatory purpose – for clear error.").

With that, we turn to the evidence at hand.

### 1. Section 1326

Congress passed the INA in 1952, overcoming a veto from President Harry Truman. *See Sanchez-Garcia*, 98 F.4th at 95. The statutory scheme arose from a comprehensive five-year Senate evaluation of the immigration system and was Congress's attempt to overhaul the patchwork of immigration laws that previously had governed entry into the country. *See generally* S. Rep. No. 1515 (1950); *see also Carrillo-Lopez*, 68 F.4th at 1143–45 (describing the Senate Report).

The debate surrounding the passage of the INA primarily focused on national-origin quotas that did not impact

immigrants from Mexico and Central American countries. *Sanchez-Garcia*, 98 F.4th at 101. In fact, the only mention of the provision criminalizing reentry in the legislative history appears in a letter from Deputy Attorney General Peyton Ford to the Senate Judiciary Committee. Letter from Peyton Ford, Deputy Att'y Gen., to Sen. Pat McCarran, Chairman of the Comm. on the Judiciary (May 14, 1951). This letter discussed "overcom[ing] the inadequacies in existing law" by allowing prosecutors to charge immigrants without determining the location of reentry. *Id.* The provision was not debated in Congress, and because of this, there is scant evidence that Congress considered how § 1326 would affect immigrants from Mexico or other Central American countries. *See Sanchez-Garcia*, 98 F.4th at 101 ("Congress never even considered what effect § 1326 might have on the Mexican and Central American immigrants the defendants claim it targeted because of their race."); *Carrillo-Lopez*, 68 F.4th at 1146 ("There was no discussion of [§ 1326's] impact on Mexicans or other Central and South Americans.").

Given the dearth of relevant legislative history, Viveros-Chavez gathers a patchwork of evidence to prove racial animus. For example, Representative Thomas Jenkins stated that the congressional debates were "reminiscent" of the passage of the UAA when Congress wanted to "keep away from our shores the thousands of undesirables just as it is their wish now." 98 Cong. Rec. 4442 (1952). Representative John Wood remarked that "Western European races have made the best citizens in America." 98 Cong. Rec. 4314 (1952). Senator Walter George recounted that the reason Congress passed prior immigration laws was "to preserve something of the homogeneity of the American people." 98 Cong. Rec. 5774 (1952). But, while such statements demonstrate the antipathy these

men may have had for immigrants generally, they were discussing other provisions of the bill that did not target Mexican and Latino immigrants.

There were statements, however, that were directed at individuals from Mexico. Senator Pat McCarrran, for instance, noted that the revisions to current immigration laws were needed "to meet the wetback situation." 97 Cong. Rec. 5320 (1952); *see also Wetback*, *Webster's New World Dictionary*, *College Edition* (1958) (defining "wetback" as "a Mexican agricultural laborer who illegally enters or is brought into the United States to work" and noting the term comes from "the fact that many cross the border by swimming or wading into the Rio Grande"). The term "wetback" also appears in the Ford letter, which observed that searches on private property would "aid in taking action against the conveyors and receivers of the wetback." Letter from Peyton Ford, Deputy Att'y Gen., to Sen. Pat McCarran, Chairman of the Comm. on the Judiciary (May 14, 1951). Furthermore, in 1952, Congress also criminalized the sheltering or transport of illegal immigrants at the southern border by passing Public Law 283, which was colloquially referred to as the "Wetback Bill." *See* Pub. L. No. 82-283, 66 Stat. 26 (1952); Decl. of Prof. Benjamin Gonzalez O'Brien (ECF No. 24-2) at 17.

But Viveros-Chavez overstates the relevance of this evidence. McCarran did advocate for legislative modifications to prevent illegal immigration from Mexico, but those changes concerned parts of the legislation that punished American citizens who assisted illegal immigrants. *See* 98 Cong. Rec. 5320 (1952). McCarran never mentioned the issue of reentry. Ford was merely quoting from another report that addressed an entirely different provision of the INA. And Public Law 283

was passed months before the INA and did not target immi-grants, but those who assisted illegal entry into the country. *See* Pub. L. No. 82-283, 66 Stat. 26 (1952) (reciting the Act's purpose to "assist in preventing aliens from entering or re-maining in the United States illegally"). To our knowledge, no legislator used "wetback" when discussing reentry proscrip-tions in general or § 1326 in particular.

Finally, Viveros-Chavez contends that President Truman's veto statement proves Congress's discriminatory intent. The statement says, in relevant part:

> [The INA is] a mass of legislation which would perpetuate injustices of long standing against many other nations of the world, hamper the ef-forts we are making to rally the men of East and West alike to the cause of freedom, and intensify the repressive and inhumane aspects of our im-migration procedures. The price is too high, and in good conscience I cannot agree to pay it.

Harry S. Truman, *Veto of Bill to Revise the Laws Relating to Im-migration, Naturalization, and Nationality*, Harry S. Truman Li-brary (June 25, 1952), https://www.trumanlibrary.gov/li-brary/public-papers/182/veto-bill-revise-laws-relating-immi-gration-naturalization-and-nationality.

The problem with this theory is that President Truman's veto statement says nothing about targeting Mexican or La-tino individuals, nor does it mention § 1326. In fact, President Truman was expressing his concern with the INA's quota sys-tem that restricted immigration from Asian countries. *See id.* ("I cannot take the step I would like to take, and strike down the bars that prejudice has erected against them, without …

establishing new discriminations against the peoples of Asia and approving harsh and repressive measures directed at all who seek a new life within our boundaries.").

All told, the district court considered all of this evidence and found that it was "insufficient to support a finding of discriminatory intent" in the enactment of § 1326. We see no clear error in this conclusion.

### 2. Disparate Impact

Viveros-Chavez attempts to bolster his argument by presenting statistical evidence that, he says, demonstrates that § 1326 "bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266 (citation omitted). If he is right, this is another fact in "the totality of the relevant facts" that a court must consider in its intent analysis. *Davis*, 426 U.S. at 242.

When considering the racial impact of a particular law, courts often look to data comparing how individuals in a protected class are affected differently from those in a similarly situated, nonprotected group. *See, e.g., id.* at 233–35 (evaluating evidence that a police department's written personnel test excluded a disproportionately high number of Black applicants compared to white applicants). Here, such evidence would include statistics showing how the enforcement of § 1326 disproportionately impacted immigrants from Mexico and Latin American countries as compared to immigrants from other regions.

To this end, Viveros-Chavez cites to data showing that, during the 2020 fiscal year, 99.1% of unlawful reentry offenders prosecuted under § 1326 were Mexican or Latino. But, as the district court observed, Viveros-Chavez offers no data as to what percentage of noncitizens subject to prosecution

under § 1326, who entered the United States in 2020, were Mexican or Latino (versus any other group). The absence of this information renders any meaningful comparison impossible.

The Supreme Court's analysis in *Regents* is instructive. There, the plaintiffs argued that the administration's recission of the Deferred Action for Childhood Arrivals (DACA) program infringed upon the Fifth Amendment's guarantee of equal protection because it disproportionately impacted Latinos from Mexico, who made up 78% of DACA recipients. 591 U.S. at 34. But the Court rejected this reasoning, noting that, "because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program." *Id.* Without any comparative data that Latino DACA recipients were treated differently than non-Latino DACA recipients, the Court noted, "virtually any generally applicable immigration policy could be challenged on equal protection grounds." *Id.*

In much the same way, Viveros-Chavez presents no data regarding what percentage of those who illegally reentered the country in 2020 were Mexican or Latino, a fact that is necessary to gauge disparate impact. For example, if Mexicans and Latinos comprised only 25% of total illegal reentrants in 2020, but 99.1% of those charged, the numbers would be more compelling. On the other hand, the evidence would be less alarming if 99% of noncitizens, who illegally reentered the country in 2020, were Mexican or Latino individuals. The record is devoid of such information.

Viveros-Chavez instead tries to fashion a disparate treatment argument using two different groups—entrants from

Canada and non-Latino noncitizens in the United States who overstay their visas. As for the first, Viveros-Chavez points to an agreement the United States had with Canada from 1935 to 1959. Under it, an individual in Canada could take advantage of a "pre-examination" process prior to entering the United States. *See* Decl. of Prof. Benjamin Gonzalez O'Brien (ECF No. 24-2) at 21. No such program was available for individuals in Mexico. As for the second, Viveros-Chavez argues that noncitizens who overstay their visas (a group, he claims, are mostly non-Mexican and non-Latino) are "not being targeted for deportation in the same manner as Mexican or Latino immigrants."

But we do not see how these groups are similarly situated to Mexican and Latino noncitizens who reentered the country even though they were previously removed, deported, or denied entry. Perhaps Viveros-Chavez's data show that, throughout our history, certain immigrant groups were favored over others. But this is far from evidence that Congress was motivated by racial animus when passing § 1326.

We recognize that § 1326 and its enforcement have had significant consequences for individuals in the Mexican and Latino communities. But such policy concerns are better directed to the political branches of our government. Here, we conclude that the district court did not clearly err in finding that § 1326 was not motivated by racial animus against Mexican and Latino persons. We therefore affirm.[2]

---

[2] The government alternatively asks that we uphold § 1326 because the legislation would have passed even without the purported racial animus. *See Arlington Heights*, 429 U.S. at 270 n.21 (noting that when racial discrimination motivates the passage of a law, the burden shifts to the government to show "the same decision would have resulted even had

## IV.  Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

the impermissible purpose not been considered"). Because we find that race was not a motivating factor in the passage of § 1326, we need not address this issue.